### McCARTY v. HERYFORD.

(Circuit Court, D. Oregon. August 18, 1903.)

#### No. 2,732.

1. BREACH OF MARRIAGE PROMISE—DAMAGES—EXCESSIVE VERDICT.

A verdict for $22,500 damages for breach of a promise of marriage, against a man shown to own property of the value of $70,000, incumbered by mortgage for $20,000, is so excessive as to indicate passion or prejudice on the part of the jury, where the offer of marriage was renewed by defendant in good faith after commencement of the action, and when the marriage would have been equally as advantageous to plaintiff, and where the claim of seduction, which was the only matter of aggravation set up by plaintiff, was not made until after such renewal offer, was denied by defendant, and not sustained by a preponderance of the evidence.

2. SAME—EVIDENCE IN MITIGATION OF DAMAGES—RENEWAL OF OFFER.

An offer of marriage by a defendant in an action for breach of promise after the commencement of the suit is admissible in evidence in mitigation of damages, if made in good faith, the jury, however, being entitled to consider any change in the character, habits, or condition of defendant between the time of the breach of the contract and the renewal of the offer which would be to plaintiff's disadvantage, or justify her in rejecting the offer.

At Law. On motion to set aside the verdict and for a new trial.

O'Day & Tarpley and Robertson, Miller & Rosenhaupt, for plaintiff.

Dolph, Mallory, Simon & Gearin, for defendant.

BELLINGER, District Judge. About December 25, 1900, the defendant made a proposal of marriage to the plaintiff, which was accepted four or five days later. It was agreed that the marriage should take place on December 25th of the following year, at the plaintiff's home in Wayne, Mich. This engagement was made in Lake county, Or., where defendant's home was, and where plaintiff was temporarily residing. About the 1st of May, 1901, plaintiff went to Ashland, where her sister resided, and thereafter returned to her home

¶ 2. See Breach of Marriage Promise, vol. 8, Cent. Dig. §§ 13, 44.

in Michigan. The parties corresponded regularly until the 10th of October of that year, when the defendant wrote to the plaintiff that he had changed his mind, and was not coming back to marry her. Further correspondence took place between the parties, the last letter being one from the defendant dated December 28th, in which he adheres to his decision not to marry the plaintiff. The plaintiff in the meantime offered to release the defendant from his promise to come to Michigan to be married, and to meet him at Reno for that purpose. On the 8th of September, 1902, this action was begun for breach of promise, for damages in the sum of $70,000. In her complaint plaintiff alleges that, "confiding in defendant's promise, she has always since remained and continued, and still is, sole and unmarried, and has been for and during the time aforesaid, and now is, ready and willing to marry the said defendant." When service of the summons and complaint was made upon the defendant he wrote to the plaintiff offering to marry her, and requesting her to meet him at Reno for that purpose. He inclosed in his letter a draft on New York for $200 to pay her expenses to Reno, and requested her to wire him the probable date of her arrival there, so that he could meet her. To this letter and offer no response was made. Plaintiff cashed the draft, and deposited the money in a local bank, taking a certificate of deposit therefor in her own name, which she has since retained. On February 24, 1903, an amended complaint was filed, from which the allegation of plaintiff's readiness and willingness to marry the defendant was omitted, and in which it was alleged that plaintiff, as the result of defendant's breach, was greatly humiliated and suffered great anguish of body and mind, to her damage in the sum of $68,100. Special damages were alleged for loss of earnings, amounting to $1,200, as schoolteacher, and for expenditures in preparing for her marriage in the sum of $700, making the total amount claimed $70,000, the amount claimed in the original complaint. The plaintiff testifies that the claim of $700 was a mistake of her attorney. The amount claimed on this account is stated in her last amended complaint at $200.

On the morning of the day of trial application was made in plaintiff's behalf for leave to file a second amended complaint, for the purpose of alleging seduction in aggravation of damages, and upon the representation of plaintiff's attorney, made in explanation of the lateness of the application, that the fact of seduction had only come to the knowledge of plaintiff's attorneys within a few days preceding, leave was granted as requested, and the second amended complaint was filed. In this complaint it is alleged that defendant, under promise of marriage, seduced the plaintiff, and it is alleged, for the first time, that plaintiff has been greatly injured in health, both of body and mind, by reason of defendant's conduct. Special damages in the sum of $1,200 are alleged on account of loss of employment as school-teacher, and for expenditures in preparing for marriage, $200. The prayer is for a judgment in the sum of $60,000, and the further sum of $1,400 for costs and disbursements in the action, in all $61,400. The jury found for the plaintiff, and assessed her damages in the sum of $22,500.

Defendant moves for a new trial because of errors which he claims were committed by the court during the trial, and upon the ground

that the damages assessed are excessive, and appear to have been given under the influence of passion or prejudice.

Plaintiff was at the time of her engagement to the defendant 30 years of age, and a school-teacher by occupation. She seems to have taught school frequently not far from the neighborhood where she lived, and during one summer in the state of Indiana, and at different periods of her life she had worked in, or had charge of, three or four different post offices. The defendant was 46 years of age, and was reputed to be worth $200,000. He was a widower with children, one of whom was an invalid. It was shown by the testimony of an attorney who had special opportunities for knowledge on the subject that the defendant was worth about $70,000, consisting of an interest in certain stock ranches in southeastern Oregon, and that he was indebted in the sum of $20,000, secured by mortgage.

A verdict in so large a sum in such a case is unusual, and I believe it to be unprecedented. Among the cases cited in plaintiff's brief on this motion, there is but one where the verdict was as large as this. That is the case of Campbell v. Arbuckle, where the verdict was for $45,000. (Sup.) 4 N. Y. Supp. 30. In this case the court, in passing upon the question as to whether the verdict was excessive, says: "The verdict was only four and one-half per cent. for one year of defendant's estate, as he admitted it to be. This cannot be deemed excessive, and affords some evidence that the jury was not influenced by any desire to punish the defendant for his failure to carry out his contract." In another case (one not cited) there was a verdict for $25,000, which was allowed to stand. The verdict was for about one-sixth of the defendant's fortune. In both of these cases unlawful relations were proposed by the defendants, but, so far as appears, they were not entered into.

The next highest verdicts to be found were for $16,000 and $12,500, respectively. Both were aggravated by seduction. In one case the defendant was worth between $50,000 and $75,000, and in the other at least $75,000. In all the cases that I have been able to find none appear that approach in the amounts awarded by the jury the cases last mentioned.

In this case the defendant's estate, as already shown, is of the value of about $70,000, subject to a mortgage of $20,000. If to this mortgage is added the amount of this verdict, with costs and disbursements, and the defendant's necessary expenses in the case, the amount will probably be more than enough to wipe out his entire estate at a forced sale, as may be inferred from the character of the property, the manner in which it is held, and the usual experience where property is sold under legal process. If a jury may thus divest a man of such an estate, and award it for general damages, its power ought to be exercised with great caution, and the facts should not be doubtful nor the injuries redressed altogether speculative in character.

The alleged seduction of the plaintiff was the thing mainly relied upon to increase her damages. It is alleged to have taken place some five weeks subsequent to the promise of marriage, and was therefore not the consideration for the promise, although the relations established by the promise may have been an inducement for an unlawful

relation between the parties. The defendant denies that he seduced the plaintiff, or that he ever had any improper relations with her. The affidavit of the landlady of the hotel at Bly, where the parties stayed one night, contradicts the plaintiff as to the defendant's conduct in engaging a room at that hotel. If this affidavit is true, the plaintiff has attempted to place the defendant in a false light in order to corroborate her statement as to their relations at that place. If she has done this in one part of her testimony as to the alleged seduction, the whole comes under suspicion. There is no explanation of the fact that the claim of seduction was not made by plaintiff, and was not known to her attorneys, until a few days before the trial of the cause. There is nothing in the letters that passed between the parties that hints of such a thing; and while on the trial it was sought to get such a meaning out of the expressions on her part that "in the sight of heaven they were married," yet these expressions do not necessarily imply improper relations between the parties, and were not so understood by her attorneys, who probably examined this correspondence beforehand, and who were not advised, as already stated, of this feature of the case until the eve of the trial. In her letter written after the defendant had informed her that he could not keep his promise to her, she recounts the wrongs done her by his faithlessness, but there is nothing said that is inconsistent with a perfectly lawful relation between them. It would seem that then, if ever, the wronged woman would have spoken; that, if in her list of grievances anything was omitted, it would not have been that grievance which is the greatest a woman can suffer at a man's hands. A letter by the plaintiff to the defendant, written on May 29th, a few days before the trial, was offered in evidence, but was not admitted. It was stated in open court, when this offer was made, that the plaintiff in that letter advised the defendant of her claim of seduction. The significance of the omission from her letters written at the time of the breach of any reference to such a charge is increased by this letter of May 29th, and by the fact that copies of these letters were kept by plaintiff, probably with a view to the use that is now made of them. Her explanation of these copies is that they were originals which, owing to her state of mind, were so written that she feared the defendant could not read them; that she therefore copied them, and sent the copies. But these originals show for themselves; they are well and plainly written. A few unimportant words are crossed out of them, the inference being that, in making the second draft, these words were omitted, and that thereafter the two drafts were carefully compared, and the words omitted in the second crossed out in the first, so that the retained original should be an exact copy of the letter sent. There is no copy of any antecedent letter. Moreover, these letters were registered, and the registry receipts are attached. She explains this by saying that theretofore in their correspondence something had been said to the effect that he did not get all of her letters; but she wrote at least two letters after this, and it seems not to have occurred to her to register these. The suspicion in which her uncorroborated testimony is involved as to this feature of the case is increased by the fact, of more or less significance, that while the alleged improper relations are said to have been main-

125 F.—4

tained for some weeks in a room over one occupied by a man and his wife, with an eight-foot ceiling; in an unplastered house, where, according to her own testimony, the noise could be easily heard by the occupants of the room below, not a breath of scandal or suspicion was created as to the relations of the parties, although the other occupants of the house testify that the occurrences narrated by the plaintiff could not have taken place without some knowledge on their part to excite suspicion of what was going on.

It is the province of the jury to decide whether the plaintiff has told the truth. The inquiry which the court makes is not to ascertain whether they have erred or not in that behalf, but whether there has been error so flagrant as to imply that they have acted under the influence of passion or prejudice. A verdict not exceptional in character, upon doubtful facts, should not be disturbed; but an exceptional verdict, against the weight of the evidence, cannot be allowed to stand. The judgment rendered upon a verdict is the judgment of the court, and the respect which is due to the verdict does not require the court in any case to enter an unjust judgment.

The law is that an offer of marriage by a defendant in a case of this kind, made after the action is begun, if made in good faith, may be considered by the jury in mitigation of damages. Kelly v. Renfro, 9 Ala. 325, 44 Am. Dec. 441; Kurtz v. Frank, 76 Ind. 594, 40 Am. Rep. 275. The cases are not in accord as to this. One case, Sperry v. Estate of Moore (Mich.) 4 N. W. 13, holds that such an offer is not admissible in mitigation of damages. The reasoning of the court is that the principle which would permit such evidence in any case would admit it in a case where a man respectable, virtuous, of wealth, etc., should subsequent to his breach enter on a life of debauchery, and then when sued offer marriage, when any woman of respectability would shrink from his polluted touch. The criticism to be made upon this reasoning is that it assumes that the jury must give the same consideration to the subsequent offer in all cases. It is a question for the jury in the particular case as to what allowance, if any, should be made because of the offer. In all cases the effect of the offer depends upon the advantages offered. If the subsequent offer is in all respects as advantageous as the first offer, there is no reason why the plaintiff should reject it for its equivalent in money. Public policy is better served with the compromise of marriage than with sensational litigation, that spreads before the public, eager to listen, the secrets of a courtship and the unsavory details of a seduction; and when it is manifest that the jury has refused to give consideration to an offer in such a case the verdict should, in the interest of private justice and public morals, be set aside. The weight of authority and the better reasoning support the rule stated. When the defendant received a copy of the original complaint in this case, containing the allegation that the plaintiff was still ready and willing to marry the defendant, the latter wrote her the following letter:

"Lakeview, Oregon, Sept. 15, 1902.
"Miss Birdie McCarty, Dear Birdie:—I was surprised when an officer to-day served me with a copy of your complaint for breach of promise of marriage; I did not believe that you would sue me for money because you so often said

you loved me for myself and I believed you, and still believe that you sued me not through your own desire but by the advice of others. You know that I have liked you for your interest and sympathy in me and admired you for your education and ability. You know too, had it not been for my great trouble caused by the sickness of my son Archie who required my constant attention during the last twelve months and as a cause of such sickness he is now totally blind in both eyes and still unable to help himself in any way. Had it not been for all this I should have gone to you and kept my promise, but surely you would not wish me to be so selfish, cruel and unfatherly as to leave my own child dying on a sick bed and go East in order to get married. You, womanlike, can understand my feelings in this matter better than I can explain them.

"I wish you to feel that I am quite willing to marry you. Could I leave my son now, I should go and tell you this in person rather than by letter, but as you promised to meet me in Reno to be married their (there) I now request that you do so as soon as convenient and notify me by wire the probable day that you will be in Reno and I shall meet you their (there) and we will be married. I enclose a draft on New York for two hundred dollars to pay for your expenses to Reno and after we are married we shall purchase such things as you think necessary to furnish our house.

"Hoping that you will come quickly to Reno so that we can be married at once and I shall try hard by kindness and affection to atone for any injury or neglect of the past.                                                J. D. Heryford."

This letter offered the plaintiff all the advantages and inducements of the original promise for which money damages are sought in this action. It is not claimed that the defendant has less wealth, or is less virtuous and respectable, than he was at the time of the breach. All the advantages that the marriage then promised her she could have had by accepting the offer of September, 1902. The reparation for her seduction, if there was seduction, would have been as complete then as if the first promise had been kept, and would have been infinitely more complete than any reparation that can be made in money. There is nothing to impeach the defendant's good faith in the subsequent offer, unless the breach of his promise has that effect, and this is plaintiff's contention. The defendant's breach is urged as evidence that his subsequent offer was not in good faith. But if the breach has that effect, then, of course, the offer of marriage made after suit cannot in any case be considered in mitigation of damages, and the rule would be abrogated by the conditions which give rise to it. Furthermore, the plaintiff was willing to come to Reno and marry the defendant in December—two months after he had notified her that he could not keep his promise to her. She was willing to trust him then, and she would have been willing to marry him at the time he made his offer after the suit was begun, so she testified, if he had come to her home for that purpose; and she would have married him, so she stated in her testimony, at the time she came to Portland to attend this trial, if he would have secured her financially.

The letters in which the defendant stated that he had changed his mind, and that he had ceased to love the plaintiff, show that a very great affliction had overtaken him in the blindness of his boy. In the first of these letters he says that "Archie is sick again," and has been so for two weeks. In the following letter he says that "Archie is blind, hasn't seen anything for two weeks, and the doctor says he may be that way always." In the meantime the blind boy was being cared for by his grandmother and the defendant. The plaintiff was

conscious of the fact that the defendant's change of feeling towards her had been influenced, if not caused, by the calamity that had overtaken his boy. In her answer to the letter which stated that he had changed his mind, she says, "I know Archie's sickness causes you to worry," and she offers to help take care of the invalid. In his letter to her of December 28, 1901, in answer to a letter of hers of the 13th of that month, he reminds her that she had said she "never could live here at Lakeview only a little while at a time," and he gives this as a reason for thinking that the marriage had better not take place. In this letter he again refers to the sick boy, who "can't see yet and cannot help himself very much."

It is not at all surprising that the feelings of this man, then 47 years old, with his hopelessly blind boy requiring constant care, should change in respect to marriage, and that he should conclude not to marry a woman who could not be content to live where he was compelled to maintain his home "only a little while at a time." There was no hope for him in such a marriage of the companionship that belongs to the married state, and it seems doubtful, from her statements to the defendant and from her testimony, whether there was expectation or desire for it on her part. These conditions do not justify his breach, but they relieve his conduct of the imputation of bad faith. The letter containing his subsequent offer is creditable to both parties. It shows a high regard for plaintiff, and a determination on defendant's part to be a good husband to her. There is no redress that a court of law can give to a woman in her situation that equals what was here offered. It seems incredible that she should have preferred to make merchandise of her good name, hitherto unsullied, by proclaiming her unchastity, in order to increase the sum of money she expected at the hands of a jury.

My conclusion is that this verdict is so grossly excessive as to imply that the jury acted under the influence of passion or prejudice, and that it should be set aside. The motion to set aside the verdict and for a new trial is allowed.